UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMY KOTT-STEPHENS,

       Plaintiff,                      Civil Action No. 12-14972

v.                                HON.  PATRICK DUGGAN
                                  U.S. District Judge
                                  HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Amy Kott-Stephens ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final  decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).   For the reasons set forth below, I recommend that Defendant's motion be GRANTED and Plaintiff's motion DENIED.

## PROCEDURAL HISTORY

On December 14, 2010, Plaintiff filed an applications for DIB and SSI, alleging a disability onset date of March 31, 2009 (Tr. 210-220).  After the initial denial of the claim, Plaintiff requested an administrative hearing, held on September 9, 2011 in Jacksonville,

Florida before Administrative Law Judge ("ALJ") Brendan F. Flanagan (Tr. 34). Plaintiff, represented by attorney Stacey Clark, testified, as did Vocational Expert ("VE") Robert Strader (Tr. 45-100, 100-108). On February 17, 2012, ALJ Flanagan found Plaintiff not disabled (Tr. 27). On May 24, 2012, the Appeals Council denied review (Tr. 4-9). On October 16, 2012, Plaintiff filed for judicial review of the final decision in the Middle District of Florida. The case was transferred to this Court on November 8, 2012.

On January 9, 2014, the undersigned held a status conference at which time, Plaintiff's counsel informed the Court that his client began part-time work in March, 2012 and had been working full time since June, 2012. The same day, the Court ordered supplemental briefing, allowing Plaintiff to amend her claim for benefits for a closed period. *Docket #23.* Plaintiff filed a supplemental motion on January 23, 2014, requesting DIB benefits for a closed period ending on May 31, 2012. *Docket #24.* Plaintiff noted that she had recently completed a nine-month pregnancy without the need for psychotropic medication.

## BACKGROUND FACTS

Plaintiff, born March 15, 1982, was just short of her 30th birthday at the time the ALJ issued the decision (Tr. 27, 210). She completed one year of college and worked as a cashier and office assistant (Tr. 258). She alleges disability due to a bipolar disorder, polycystic disorder, depression, and neck and shoulder pain (Tr. 257).

### A.    Plaintiff's Testimony

*Plaintiff's counsel stated that although her client experienced pain due to*

-2-

*fibromyalgia, none of her physical conditions precluded work* (Tr. 45).

Plaintiff then offered the following testimony:

She currently lived in an apartment with her boyfriend and dog in Jacksonville, Florida (Tr. 46). She did not experience problems reading or performing simple calculations (Tr. 47). She attended a community college for one year (Tr. 48). She held a valid driver's licence and drove a car with manual transmission (Tr. 48). She drove approximately four times each week, including 17-mile trips to her therapist (Tr. 48-49). She also drove to a local grocery store or nearby Wal-Mart (Tr. 50). She received directions to the hearing location by consulting MapQuest (Tr. 51). She received therapy once a week and saw a psychiatrist once every two weeks (Tr. 49).

She and her then-husband moved from Washington D.C. to California in March, 2009 then later moved to her mother-in-law's house in South Carolina (Tr. 51-52). She moved to Florida in November, 2010 (Tr. 53). She stood 5'4" and weighed 150 pounds (Tr. 54). She currently smoked a half-pack of cigarettes each day but no longer drank (Tr. 54). She denied prescription drug abuse (Tr. 55). During her stay in California, she "self-medicated" with alcohol four to five times a week (Tr. 56). She reduced her alcohol intake after being married (Tr. 57).

While living in California, Plaintiff was unable to obtain therapy due to lack of insurance (Tr. 58). She spent her time "job-hunting" (Tr. 58). During the spring and summer of 2009, she and her husband traveled between California, Washington D.C., Michigan, San Diego, San Francisco, and Lake Tahoe (Tr. 59). After moving to South Carolina, she held

two short-term positions acquired through an employment agency (Tr. 61). Her most recent long-term job was working as a "lock desk operator" for a mortgage company in 2006 (Tr. 64). Prior to that position, she worked as an office assistant (Tr. 65). She also worked as a nail technician and retail clerk (Tr. 66-68). She reported that she sought work after being discharged from inpatient mental treatment in November, 2010 (Tr. 69).

Plaintiff was capable of performing a full range of self care and household tasks but due to psychological symptoms, did not perform them on a consistent basis (Tr. 71). She denied problems handling a bank account, but noted that her mother was currently depositing money into a joint checking account for Plaintiff's use (Tr. 71-72). Her hobbies included sewing, but she had not sewn anything since the previous May (Tr. 73). She attempted to earn money by making handmade jewelry, but had not made a profit (Tr. 74). She could lift up to 30 pounds (Tr. 76).

She currently performed cleaning and cooking chores in exchange for apartment rent (Tr. 77). She typically cooked "chicken, hamburgers, or pasta" (Tr. 78). On a "good" day, she would shop for groceries, do laundry, and clean the apartment (Tr. 78). On a "bad" day, she would spend most of her time in bed (Tr. 78-79). She checked the employment section of the online newspapers regularly (Tr. 82). She last read a book in September, 2010 (Tr. 82). She and her boyfriend dined out and went to the beach occasionally (Tr. 83). She did not have any friends in Florida, but texted or emailed out-of-state friends occasionally (Tr. 83). She attended motorcycle functions ("bike night") occasionally with her boyfriend (Tr. 83).

Plaintiff stopped seeing Dr. Shaw after he recommended additional "shock therapy" (Tr. 85). She currently received treatment with a nurse practitioner in conjunction with her psychiatric treatment (Tr. 85-87). She opined that she was unable to work due to mood swings and memory problems (Tr. 87).

In response to questioning by her attorney, Plaintiff reported that she began taking medication for depression when she was 18 (Tr. 87). She stopped treatment in 2008 after she lost her health care insurance (Tr. 88). She resumed treatment in January, 2010 (Tr. 88). She reported that she had undergone electro-convulsive therapy ("ECT") as a "last resort" in her attempts to get better (Tr. 89). The therapy initially improved her moods but later made her more depressed and created memory problems (Tr. 90). Her "bad days" sometimes lasted up to two weeks (Tr. 92). In 2010, she was discharged from a job after experiencing memory problems and the medication side effect of drowsiness (Tr. 93). She experienced sporadic sleep disturbances (Tr. 94). Her marriage failed due to her inability to keep a job and attend to her household responsibilities (Tr. 96). As a result of ECT, she experienced permanent memory problems (Tr. 97). In the recent year, she had driven from Florida to Michigan with her mother, visited friends in western Michigan, driven to Washington D.C. and then back to Florida on her own (Tr. 100).

**B.    Medical Evidence[1]**

**1.  Treating Sources**

---

[1]Treatment records unrelated to the basis for disability, reviewed in full, have been omitted from the present discussion.

In December, 2007, Plaintiff sought psychological therapy, reporting intermittent sadness and excitement (Tr. 371). She indicated that formerly prescribed antidepressants were ineffective (Tr. 371). Psychiatrist Margaret F. Jensvold, M.D. prescribed Wellbutrin and directed Plaintiff to begin psychotherapy with social worker Edith Mahlmann (Tr. 369). In June and July, 2008, Plaintiff was assigned a GAF of 60[2] (Tr. 360, 363). A July, 2008 medication review states that Plaintiff appeared tense with "fair/good" judgment and an good grooming (Tr. 360). A medication review from the following month indicated a GAF of 70[3] (Tr. 347). The following month, Plaintiff reported that she was "dating a lot using Match.com" (Tr. 342). Lee Thomason Budahn stated that Plaintiff's depression "seems to be resolving" (Tr. 342).

Mikki Backman's February, 2010 therapy notes state that Plaintiff admitted to blacking out after mixing alcohol and drugs (Tr. 600). In September, 2010, Plaintiff was admitted for inpatient psychiatric treatment after exhibiting symptoms of a bipolar disorder including suicidal ideation (Tr. 375-376). Plaintiff "cycled" between depression and hypomania for the first few days of treatment but was stabilized with medication and

---

[2]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision,* 34 ("*DSM-IV-TR*" )(4th ed.2000).

[3]GAF scores in the range of 61-70 indicate "some mild [psychological] symptoms or some difficulty in social, occupational, or school functioning." *DSM-IV-TR* at 32.

individual and group therapy (Tr. 377).  She was assigned a GAF of 50[4] upon discharge with a diagnosis of bipolar disorder with psychotic features (Tr. 377).

July, 2010 treating notes by Perry Trouche, M.D. state that Plaintiff was fully oriented with a "frustrated" mood (Tr. 635).  She reported auditory hallucinations (Tr. 636). November, 2010 treating notes by Dr. Trouche state that Plaintiff had recently been fired from her job (Tr. 623).  The same month, Plaintiff was again admitted for inpatient psychiatric treatment due to alcohol abuse and worsening symptoms of a bipolar disorder after her husband announced his intention to divorce her (Tr. 394).  Atul M. Shah, M.D. noted a history of alcohol abuse, drug, abuse, and polycystic ovarian syndrome (Tr. 395). She denied hallucinations, stating that she experienced "fleeting suicidal contemplation with no immediate intent or plans . . ." (Tr. 392).  Plaintiff reported that she currently worked as an administrative assistant (Tr. 391).  She was assigned a GAF of 25-35[5] at the time of admission and 40-45 upon discharge seven days later (Tr. 389).  Followup outpatient treatment notes by psychologist Natalie M. Stamey created in December, 2010 state that Plaintiff was impulsive with rapid speech (Tr. 399, 527).  The same month, social worker

---

[4]A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job.  *DSM-IV-TR* at 34. (4th ed.2000).

[5]

A GAF score in the range of 21-30 is associated with "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment OR inability to function in almost all areas. " *DSM-IV* at 34.  A GAF score of 31–40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *Id.*

Mikki Backman, noting her 10-month treating history with Plaintiff, opined that "[a]ny consideration about return to work at this time is unrealistic" (Tr. 468).

In January, 2011, nurse practitioner Virginia Greiner conducted a psychological evaluation, noting Plaintiff's inability to enjoy herself (anhedonia), suicidal ideation, and fatigue (Tr. 442). Greiner noted that Plaintiff was currently going through divorce proceedings (Tr. 443). Greiner noted that Plaintiff was able to "hold a job" for two years while living in Washington, D.C. despite symptoms of depression (Tr. 444). Dr. Stamey's records from the same month state that Plaintiff was "more stable and rational than . . . prior to . . . holiday trip and spoke enthusiastically about her new boyfriend" (Tr. 524, 526). Records from the following month state that Plaintiff was negative for suicidal ideation or psychosis (Tr. 436).

Dr. Stamey's March, 2011 records state that Plaintiff was tearful and "staying in bed all day" (Tr. 518). Greiner's April, 2011 records state that Plaintiff indicated that she felt "happy and productive" (Tr. 502). The following month, Plaintiff appeared disheveled with "severe psychomotor slowing" (Tr. 498). June, 2011 treating notes state that Plaintiff was currently undergoing ECT two times a week with good results (Tr. 496, 556). Dr. Shah's records state that despite several medication changes, Plaintiff experienced mood swings (Tr. 569). Plaintiff reported stress as a result of her boyfriend's out-of-town travel (Tr. 496). Dr. Stamey's notes state that Plaintiff's mood was "much improved" (Tr. 513). Dr. Stamey's notes from the following month state that Plaintiff became angered recently after discovering evidence of her husband's unfaithfulness during their marriage (Tr. 509). Plaintiff noted that

-8-

she was preparing to leave on a trip (Tr. 508). The same month, treating records by Carlos Torrellas, M.D. state that Plaintiff's psychological problems were exacerbated by unemployment, financial problems, and social isolation (Tr. 588). Dr. Torrellas noted that Plaintiff had consumed alcohol as of the previous month (Tr. 585).

The following month, Dr. Stamey was deposed by Plaintiff's attorney, Stacy Clark (Tr. 530). Dr. Stamey testified that she diagnosed Plaintiff with a bipolar disorder (Tr. 533). She opined that ECT treatments resulted in "fewer [mood] extremes" (Tr. 537). Dr. Stamey opined that Plaintiff experienced marked limitations in daily living, social functioning, and concentration, persistence, and pace (Tr. 538). Dr. Stamey noted that Plaintiff did not eat consistently or change clothes if her "significant other" were out of town (Tr. 538-539). She opined that Plaintiff's "vacations" were "periods of agitation," after which Plaintiff might stay in bed for the next two weeks (Tr. 540). She stated that Plaintiff lacked motivation and concentration sufficient "to really get anything accomplished" (Tr. 541). She found that Plaintiff had experienced periods of decompensation (Tr. 542). She opined that Plaintiff experienced a bipolar disorder "for a significant amount of time" prior to the diagnosis (Tr. 545). She found that Plaintiff was "still not able to work" and continued to experience mood swings (Tr. 547). She opined that Plaintiff would be unable to live alone indefinitely (Tr. 547).

In January, 2012, Plaintiff was admitted for inpatient treatment after taking "a handful" of sleeping pills following a breakup with her boyfriend (Tr. 639). She initially denied but later admitted to a suicide attempt (Tr. 639, 654). She was given a "markedly

-9-

guarded" prognosis with a GAF of 20-25[6] at the time of admission (Tr. 641). She was discharged with a GAF of 45-50 (Tr. 661). She was referred to an Alcoholics Anonymous ("AA") sponsor (Tr. 665).

### 2. Non-Treating Sources

In February, 2011, psychologist Robin Johnson, Ph.D. performed a consultative examination on behalf of the SSA, noting that Plaintiff was currently under the care of a psychiatrist (Tr. 409). Dr. Johnson noted that Plaintiff was fully oriented with a logical thought process and "no impairments in her concentration or attention" or memory deficiencies (Tr. 409). Dr. Johnson assigned a GAF of 70 with a good prognosis, noting that Plaintiff could "understand, remember and perform complex tasks independently" with a "moderately compromised" ability to concentrate for extended periods (Tr. 410).

In March, 2011, a Psychiatric Review Technique performed by David Partyka, Ph.D. on behalf of the SSA found the presence of bipolar and anxiety-related disorders and a substance addiction disorder (Tr. 416, 419, 421, 424). Under the "'B' Criteria," Dr. Partyka found moderate limitation in social functioning and moderate limitation in concentration, persistence, and pace (Tr. 426). He noted "one or two" episodes of decompensation (Tr. 426). Dr. Partyka also completed a Mental Residual Functional Capacity Assessment, finding that Plaintiff's ability to maintain attention for extended periods, interact

---

[6]

A GAF score of 11–20 indicates "some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication." *DSM-IV* at 34.

appropriately with the public, accept instructions, and respond to workplace changes was moderately limited (Tr. 430-431). Citing Dr. Johnson's consultative findings, he found that Plaintiff "should be able to cope with at least mild stress and changes in the environment" (Tr. 433).

In May, 2011, Nancy Hinkeldey, Ph.D. completed a second Psychiatric Review Technique, finding the presence of bipolar and anxiety-related disorders, and a substance addiction disorder (Tr. 448, 451, 453, 456). Under the "'B' Criteria," Dr. Hinkeldey found moderate limitation in activities of daily living, social functioning, and concentration, persistence, or pace (Tr. 458). Dr. Hinkeldey also completed a Mental Residual Functional Capacity Assessment, finding moderate limitation in the ability to understand, remember, or carry out detailed instructions; maintain attention for extended periods or work within a schedule; complete a workweek without psychologically based interruptions; or behave appropriately with the general public and coworkers (Tr. 463). Dr. Hinkeldey concluded that Plaintiff's limitations did not prevent her from understanding, retaining, or carry out simple instructions or performing "routine tasks on a sustained basis (Tr. 464).

### 3. Evidence Submitted After the February 17, 2012 Administrative Decision

The newer records, mostly duplicates of the January, 2012 inpatient records, state that Plaintiff was discharged on January 16, 2012 after ceasing to demonstrate suicidal ideation or plans (Tr. 682).

### C. The VE's Testimony

The VE categorized Plaintiff's past relevant work as a dispatcher as exertionally

sedentary[7] with a Specific Vocational Preparation ("SVP") of 3[8]; data entry clerk,

sedentary/SVP 4; mortgage clerk, sedentary/SVP 3; receptionist, sedentary/ SVP 4; alteration

clerk, light/SVP 3; purchase clerk, sedentary/ SVP 4   (Tr. 102).   The ALJ posed the

following set of hypothetical limitations to the VE taking into account of Plaintiff's age,

education, and work experience:

> [A]ssume . . . the residual functional capacity to perform work with no
> exertional limits.  Mentally, would be able to perform or would be limited to
> simple, routine, repetitive tasks.  Would be able to concentrate and persist for
> two-hour segments.  Take a short break of a minute or two and resume.  The
> work would be limited to occasional changes in the work setting.  And
> occasional interaction with crowds, public, co-workers, and supervisors.
> Would not be able to meet fast-paced high production demand work.  And
> would be absent or late once or less per month (Tr. 102-103).

The VE testified that given the above limitations, the individual would be unable to perform

---

[7]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds
at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying
of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at
a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that
exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent
lifting or carrying of objects weighing up to 50 pounds.  *Very Heavy* work requires "lifting
objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects
weighing 50 pounds or more. § 404.1567(e).


[8]SVP measures the "amount of lapsed time required by a typical worker to learn
the techniques, acquire the information, and develop the facility needed for average
performance in a specific job-worker situation." DOT, Appendix C,
http://www.occupationalinfo. org/appendxc1.html#II (last visited on November 18,
2013).  Pursuant to 20 C.F.R. 404.1568, "unskilled work corresponds to an SVP of 1-2;
semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP
of 5-9 in the DOT." SSR 00-04p.

any of Plaintiff's past relevant work, but could perform the unskilled, exertionally medium work of a cleaner II (11,800 positions in the state of Florida); "regular" cleaner (56,900); and exertionally light work of a housekeeper (29,500); and vehicle cleaner (4,400) (Tr. 103-104).

The VE found that the "substantial loss" in the ability to understand, remember, carry out work, follow simple instructions, use judgment, or respond to supervision, co-workers, or changes in the workplace would preclude all work (Tr. 105).

In response to questioning by Plaintiff's attorney, the VE stated that the need to be absent two or more times a month would preclude all work (Tr. 105). The VE also testified that the need to be off-task for at least 25 percent of the workday or, the inability to interact with the public or coworkers would also preclude all work (Tr. 107-108).

### D. The ALJ's Decision

Citing Plaintiff's treating records, ALJ Flanagan found that Plaintiff experienced the severe impairment of bipolar disorder, alcohol dependence, and cannabis dependence but that none of the conditions met or equaled a listed impairment under 20 CF.R. Part 404, Subpart P, Appendix 1 (Tr. 18-19). He determined that Plaintiff experienced moderate limitation in activities of daily living, social functioning, and concentration, persistence, or pace (Tr. 19). He found that Plaintiff retained the Residual Functional Capacity ("RFC") for a "full range of work at all exertional levels" within the following limitations:

> [S]imple, routine, repetitive tasks. The claimant is able to concentrate and persist for two hour segments with a short break for 1-2 minutes and resume. She is limited to occasional changes in the work setting. The claimant is limited to occasional interaction with crowds, public, coworkers, and supervisors. The claimant cannot meet fast paced, high production demand

work, and would be absent or late once per month (Tr. 20).

Citing the VE's testimony, the ALJ found that Plaintiff could perform cleaner, housekeeper, and cleaner of vehicles (Tr. 26-27).

The ALJ discounted disability opinions by Backman and Dr. Stamey, instead adopting Drs. Paryka and Hinkeldey's finding that Plaintiff was capable of a limited range of work (Tr. 23-24). He noted that the alleged disability did not prevent Plaintiff from planning a "destination" wedding in the Carribbean, making long distant driving trips by herself, and performing errands (Tr. 25). He observed that Plaintiff's testimony that she had not used cannabis in several years contradicted treating records indicating that she used the drug in 2009 (Tr. 25).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account

-14-

whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

-15-

**The Treating Source Analysis**

Plaintiff argues that the ALJ erred by declining to adopt Dr. Stamey's August, 2011 deposition testimony. *Plaintiff's Brief* at 14; *Docket #14*; (Tr. 538). Specifically, she contends that Dr. Stamey's finding of marked functional limitations supported a disability finding at Step Three of the sequential analysis pursuant to Listing 12.04. *Id.* at 12-14. On a related note, Plaintiff contends that the finding that Backman was not an acceptable medical source stands at odds with 20 C.F.R. § 404.1513(a)(2) which states that a "licensed or certified psychologist" is an "acceptable medical source." *Id.* at 11.

Listing 20 C.F.R. part 404, Subpart P, Appendix 1, § 12.04 (affective disorders) states in pertinent part ("'A' Criteria"):

> *Affective Disorders:* Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
> A. Medically documented persistence, either continuous or intermittent, of one of the following:
> 1. Depressive syndrome characterized by at least four of the following:
> a. Anhedonia or pervasive loss of interest in almost all activities; or
> b. Appetite disturbance with change in weight or
> c. Sleep disturbance; or
> d. Psychomotor agitation or retardation; or
> e. Decreased energy; or
> f. Feelings of guilt or worthlessness; or
> g. Difficulty concentrating or thinking; or
> h. Thoughts of suicide; or
> i. Hallucinations, delusions or paranoid thinking.

Assuming that Plaintiff meets one or more of the above symptoms, she must also show (under the "'B' Criteria") that the condition results in at least two of the following:

-16-

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. [marked] Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or
4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

*or* (under the "'C' Criteria):

"repeated episodes of compensation," [or]a disease process in which "even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate," or "a current history of 1 or more years' inability to function outside a highly supportive living arrangement . . ."

Dr. Stamey found that Plaintiff exhibited many of the "'A' Criteria" symptoms (Tr. 533-534) along with uniformly "marked" limitations and repeated episodes of decompensation under the "'B' Criteria" (Tr. 538).

An opinion of limitation or disability by a treating source is entitled to deference. "[I]f the opinion of the claimant's treating physician is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue, 573* F. 3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(*citing Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544 (6th Cir. 2004)). Further,

[i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion. *Wilson,* at 544.

-17-

In addition, "the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Cole v. Astrue* 661 F.3d 931, 937 (6th Cir. 2011)(citing 20 C.F.R. § 404.1527(c)(2)).

The ALJ did not err in rejecting Dr. Stamey's deposition testimony. He found that Dr. Stamey's opinion that Plaintiff was unable to live independently stood at odds with Plaintiff's ability to live by herself for extended periods while her boyfriend was out of town (Tr. 25). He also noted that Dr. Stamey's opinion of functional restrictions was based largely on the subjective claims and was flatly contradicted by Plaintiff's "wide variety of activities" including  sewing, cooking, making jewelry, taking care of her dog, attending "'bike night' parties," going to the beach, and making multi-state car trips (Tr. 25). He noted that Plaintiff used the computer to search for jobs and check her Facebook account (Tr. 25). While Plaintiff argues, in effect, that her multi-state trips were made only during her "manic phases," the treating records do not support the conclusion that she made spontaneous trips on a "tangent," but rather, shows that she planned at least one trip well in advance of her departure date (Tr. 508). Significantly, the ALJ did not reject all of Plaintiff's allegations of psychological limitation, but instead, crafted an RFC limiting her to occasional interaction with the public, coworkers, and supervisors and a preclusion on high production work (Tr. 20).

The related argument that the ALJ erred by finding that therapist Backman was not an acceptable medical source is not well taken. While Backman appears to hold a Diplomate

in Clinical Social Work ("DCSW"), a social worker does not constitute an "acceptable medical source" for purposes of 20 C.F.R. § 404.1527(c)(2). Thus, her opinion was entitled to no special deference. SSR 06–03p, 2006 WL 2329939, *2 (2006). To be sure, Backman's opinion, "should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file," *Id.* However, Backman's findings are referenced twice in the administrative opinion. The ALJ summarized Backman's 2010 treating notes and her December, 2010 opinion that Plaintiff was unable to work (Tr. 23, 468) then later articulated his reasons for rejecting Backman's opinion by noting that it was contradicted by the findings of Drs. Hinkeldey and Paryka (Tr. 24-25). Because the rejection of Backman's opinion was well explained and well supported, remand on this basis should be denied.

In closing, because the ALJ's findings were well articulated and within the "zone of choice" accorded the administrative fact-finder, the Commissioner's determination should be upheld. *Mullen, supra,* 800 F.2d at 545. However, my finding that substantial evidence supports the conclusion that Plaintiff was not continuously disabled for 12 months should not be read to trivialize her former personal and psychological difficulties. Although Plaintiff's subsequent improvement is irrelevant to the present claim for benefits, the Court applauds her current ability to work full time and function without the use of psychotropic drugs.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's motion be GRANTED and Plaintiff's motion DENIED.

-19-

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Issue first raised in objections to a magistrate judge's report and recommendation are deemed waived. *U.S. v. Waters,* 158 F.3d 933, 936 (6th Cir. 1998). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: January 31, 2014                    s/R. Steven Whalen
                                            R. STEVEN WHALEN
                                            UNITED STATES MAGISTRATE JUDGE

-20-

I hereby certifty that a copy of the foregoing document was sent to parties of record on
January 31, 2014, electronically and/or by U.S. mail.

s/Michael Williams
Case Manager for the
Honorable R. Steven Whalen